The President of the United States Court of Appeals in 4th and 7th years of serving. Hear ye! Hear ye! Hear ye! All persons having business with one's honorable court are admonished to draw near and give their attention. This court is now sitting. Judge of the United States and the time on the floor. Good morning. Good morning Judge Rovner. Good morning Judge Flom. Good morning. Good morning. And good morning to everyone in the courtroom. Sorry for the short delay. All right, we will begin. First case of the day is 22-14-82, Jennifer Miller et al. v. Marc Smith. Mr. Masterman. Good morning, your honors, and may it please the court, Joe Masterman for the plaintiff's appellants. Shirley, good morning. Good morning, your honor. Mr. and Ms. Miller wish to possess operable firearms in their home, either secured on their person or safely stored away. This conduct is protected by the plain text of the Second Amendment, but this conduct is prohibited by the regulations at issue here. Under Bruin, it is the state's burden to demonstrate that these regulations fall within a tradition of firearm regulation in this country. But the state does not identify a single historical law that restricts firearm possession by adults in their private homes in order to prevent children from accessing those firearms. Mr. Masterman, in discussing the relevant historical time period, you know, the time period for understanding the Second Amendment as applied to the states, I would very much appreciate it if you could respond to the argument that appears on page nine of Everytown's amicus brief. I'm referring to the discussion of 1868 and McDonald, and in particular, Everytown's observation that, and I'm going to quote, it would be extraordinary if the public understanding of the right in 1868 were so central to whether the right was incorporated against the states, but are relevant to what right was incorporated. Why would the court be discussing 1868 and McDonald if you are correct, as you stated in your briefs, that only 1791 is relevant? Your Honor, the court was discussing 1868 because, as you say, the question was whether the right applied against the states. But the scope of the right that was being applied against the states, the critical time for determining that question is 1791. And that is clear from the court's precedence, which Bruin reaffirmed. The court has held in Heller that the scope of the Second Amendment right is based on its original meaning at the time of the founding. And the court was clear in McDonald that the right that was applied against the states is the same right that applies against the federal government. But Everytown also points out in its amicus brief, and that's at page 10, that the Bruin court discussed and cited 18th and 19th century laws in reference to sensitive places. How is the plaintiff's analysis consistent with that discussion? Your Honor, Bruin was also very clear that in discussing evidence from after 1791 or after the founding period, the interest in that evidence is purely secondary. The question remains, the critical question remains, what the scope of the right was at the founding. And Bruin did note that there was a scholarly debate on this question. But Bruin in no way changed the precedence of Heller and McDonald and even other precedents like Gamble and Ramos that established that when you're looking at what the scope of the right is as applied against the states, you need evidence from the time of the founding. And evidence that was considered from later periods was considered insofar as it was confirmatory of the scope of the right at the founding. But Bruin also made very clear that later evidence cannot overcome the meaning that the right was understood to have at the founding. And indeed, it said that it's relevant if there is no analogous law to the modern regulation being considered from the time of the founding. That suggests that that type of regulation was not understood to be within the scope of the right that is being applied against the states. And here, Your Honor, you have no analogous law to these regulations. You have no law that limits adults from possessing firearms in their homes. You don't even have a law that limits adults from possessing firearms in schools, which the state tries to say is analogous. All of the historical evidence that you have shows that the students in those schools, minors, were prevented from possessing firearms. That is obviously a different type of regulation with a different justification than a law that prevents adults from possessing firearms. And there is no law, again, where the adult caregivers, where the teachers, where the employees at schools were prevented from possessing firearms from any relevant period here. You know, the Millers contend that the children in their care will be perfectly safe if they carry their firearms securely on their persons, including when they are foster parents. Do the Millers ever sleep? Do they bathe? If so, what do they do with their firearms at those times? Do they lock them away? I'm sorry, Your Honor. What the Millers seek to do, and they testify to this effect, and this is in the uncontested facts, they seek to either carry firearms on their person while they're in the home or to store them in locked storage. Children in their care will not have access to these firearms. And to be clear, there is no evidence in the record either that there is a concern of children somehow resting away firearms in foster care settings from the adults possessing them. Mr. Masterman, I'd like to focus in on the foster care rules and specifically the question of the unconstitutional conditions doctrine. How are we to gauge the interaction between the Second Amendment constitutional right recognized in Heller and the regulations that are promulgated here? And I want to stick to the foster care rules because there seem to be different strands of unconstitutional conditions doctrine cases, takings, First Amendment, 14th Amendment. And the tests that are applied seem to be somewhat specific to the strand. What are we to do with that? So, Your Honor, I'll give you a categorical answer and a specific answer. So, categorically, we think that Bruin is the test for Second Amendment questions specifically. We think that it is clear that when you're looking at a Second Amendment regulation, whether it be direct or indirect, you have to apply the Bruin framework. Which means here, in terms of the licensing argument, you have to look at, or the state needs to provide, evidence that states use their power as contractors historically to limit firearms in the ways that they're doing so here. So we think the same text and history analysis is the standard for Second Amendment questions. But more specifically, you're right, Your Honor, when you're looking at unconstitutional conditions, you're looking at the substantive constitutional standard that applies to the right being asserted. So they, for example, cite this Burgess case, which is from this court, and it's a Fourth Amendment case. And they try to argue that Burgess establishes this reasonableness standard that always applies in unconstitutional conditions cases. But the court there mentioned reasonableness specifically because that was a Fourth Amendment case, and that is the Fourth Amendment standard. So that confirms that when you ask whether the state is doing something indirectly that it can't do directly, you simply look at, well, could the state violate this right in this way if it were doing so directly? In the Fourth Amendment, you ask if it's a reasonable search. In the Second Amendment, you ask whether the state has a historical tradition of firearm regulation to back up the regulation. So it's the application of Bruin, the how and why metrics, under history and tradition, even in light of the unconstitutional conditions doctrine that we have. Yes, Your Honor. The unconstitutional conditions doctrine, it's basically saying if the state can't do something directly, it can't buy the right to do that through a contract. So we are saying the state couldn't simply tell the Millers, get rid of your firearms from your home. That would violate Heller. And by the same token, the state can't simply tell the Millers, get rid of your firearms because you're running a daycare, A, because there's no historical support for that specific type of regulation. But also, B, the state has no historical support for this more general argument that it can impose contract conditions that it couldn't otherwise impose. So much of the unconstitutional conditions doctrine case law asks us to apply a reasonableness standard. And again, staying within foster care rules, if we're talking about that subsection O and the firearms form they have to fill out, a reasonableness analysis applied to that type of a format is not going to be dissimilar to other constitutional rights implicated by the administrative regulations. Specifically, I'm thinking the Fourth Amendment search or the First Amendment freedom of religion, expression of religion. Given that, are you asking us to step out away from the way the Bill of Rights has been interacted with the administrative regulations by asking us just to apply the Bruin test? I'm telling you both that, yes, Bruin is the test that applies here, but also that we just don't think that reasonableness is this baseline standard for unconstitutional conditions. We think reasonableness language is coming from these Fourth Amendment cases that you're looking at. And as for the First Amendment cases that they cite, Garcetti, for example, or the CIA case that Judge Posner cited in the Burgess case, those were simply applying substantive First Amendment doctrine. They were looking at whatever tier of scrutiny applied to the speech at issue and it asked how reasonable was this restriction in relation to the burden. So there was discussion of reasonableness there as well because that was part of the substantive doctrine. And here, reasonableness is not part of Second Amendment doctrine anymore under Bruin. Bruin is very clear that you can't interest balance when you're talking about the Second Amendment. Can you tell us the status of this Western District of Michigan case, Johnson v. Lyon, where foster care homes were found not to be a sensitive place? I cannot tell you that right now, Your Honor. I'm sorry. We can submit something supplemental if you want. You know, in Bruin, of course, the court reaffirmed what the parties have called the sensitive places doctrine. And you seem to want to call this as dicta. But it has appeared in all of the modern Supreme Court gun cases. I think the lower courts are bound by it, to be perfectly honest. Now, I am not convinced by the plaintiff's argument that Camelot is inapplicable in this context. Foster homes are government subsidized. And I assume that I would hope that you would agree or I should just say I assume that you would agree that the state as guardian has a right to set safety conditions for the children in foster care. If the gun regulations for foster homes are simply part and parcel of the agreed safety conditions for a government contractor and not some backdoor attempt at general gun control, then where is the constitutional problem? The plaintiffs have the key to the door that will allow them to have all the guns they want in their home. If they do not want to comply with the government's inspections and safety conditions, they can simply opt out of the foster care program. I'll try to respond to the various points in there, Your Honor. One, voluntariness is not relevant to the unconstitutional conditions doctrine. The unconstitutional conditions doctrine applies whether or not you have an entitlement to a benefit or not. So the voluntariness of the Miller's participation doesn't affect the analysis here. But as to whether the sensitive places analysis is dicta, we think it definitionally is whether or not a school or any other place was a sensitive place, was not presented to the Supreme Court. And the Supreme Court in all of these cases, Heller, McDonald, Bruin, simply said we assume but was very clear that it was not conducting the historical analysis necessary to determine whether or not a place is a sensitive place. And under Bruin, courts now have to simply apply the text and history analysis to determine whether a place is a sensitive place or not. As to the part and parcel question, Your Honor, that is a question in the First Amendment context about whether a law is a valid funding restriction versus an unconstitutional condition. That's not an issue here. We are talking about, yes, certainly the state can, for children in its custody, regulate those children's firearm possession. And that's all that there is historical evidence to do here. But also, the state as contractor can't simply say we have this interest and therefore we can impose it on contractors in a way that we couldn't impose it on anyone else directly. That's precisely what the unconstitutional conditions doctrine doesn't allow. Mr. Matson, you've gone into your rebuttal, but of course I will give you the time you requested. Thank you very much, Your Honor. Thank you. Ms. Hunger. Good morning, Your Honors, and may it please the court. Deputy Solicitor General Sarah Hunger on behalf of the state defendants. I would like to start by discussing something that my opposing counsel just said about sensitive places and Bruin. Bruin was extraordinarily clear that it is settled as a historical matter that schools are sensitive places. It then was extraordinarily clear it instructed lower courts to use analogies to those settled historical places in order to create or identify new and analogous places. And that is what we are doing here in this case. This is a textbook application of Bruin. Daycares and foster homes are analogous to schools. There is no need to get into the founding era versus reconstruction era debate here because it's already been determined as a historical matter, schools are sensitive places. The only question for Your Honors in that context is whether or not daycares and foster homes are analogous, and they are. All three facilities are facilities that revolve around the care, education, and protection of children. They are licensed and overseen by the state. When children are there, the state licensees are responsible for their care in a sort of in loco parentis setup. That is a straightforward application of Bruin, and this court should affirm on that basis alone. Now, I would also like to discuss the government contractor's point because I think there are a few things to clear up there as well. When the state is acting in a non-regulatory capacity, which is the case here, the state is the legal guardian of these children. As such, it has decided that a home environment is better for these children who have been neglected, abused, otherwise traumatized. In order to facilitate that, they contract with foster parents, and they set safety standards. One of those safety standards is the sensible requirement, and also it's consistent with national standards. Almost every state in the country has these standards, and this is what the federal government in 2019 and 2020 indicated that the state should do. This is not an outlier regulation. If you are a foster parent and you are taking care of these children that the state has guardianship over, you have to store your firearms safely. Otherwise, there can and would be serious injury or death that could occur to the foster child or to others in the home. Let's explore that a little bit, Ms. Hunger, because we're not here to speak to the rightness or wrongness of the policy, right? Correct. And you're correct that a premise of much of this discussion is accident or suicide. Yes. What about the other half of that, the foster parent or the daycare operator protecting? Correct. I would note that we put forward unrebutted evidence at the district court, the Miller and Azrael report, that took into account whether or not there was a countervailing safety measure in having the foster parents armed, and they concluded that under the relevant literature, there was none. And the plaintiffs have not rebutted that. The district court was less than excited about that report, though, correct? No, the district court did accept it and said that it was relevant. And I also note that it is de novo review, for your honors. But that was the conclusion, and the plaintiffs have not set forth anything to counter that. I mean, they say, well, there may be an attack on the home, but they have nothing to back it up beyond speculation. And we're at summary judgment here. We put forward the evidence, and they have not rebutted it. I would also note, with respect to the standard, Bruin said the Second Amendment right should be treated the same as every other right, and that's all that we're asking to be done here in the government contractor context. We're not asking for special treatment for the Second Amendment. We are saying this court, other courts, the Supreme Court in the NASA case said, you know, when the government is acting as a contractor, the constitutional inquiry, quote, must account for the distinction in those roles. Same question I asked to Mr. Masterman, then. We've got these various strands of the unconstitutional conditions doctrine, NASA, ENGVST, going all the way back to Frost, right? And each of those different strands seem to apply somewhat different tests. ENGVST and NASA clearly ask us to balance, but isn't balancing just backdooring what the Supreme Court in Bruin said we shouldn't do? No, it's not, because we are in the government contractor context, and I agree with you that there are slight variations on the tests if you look at the different constitutional rights, but the clear through line in those cases is reasonableness, and I would also note another one, which is, is the government imposing this burden in a gratuitous way in order to coerce people to do what they otherwise couldn't, or is it part of the program? And I think here nobody could suggest that this is some sort of gratuitous requirement. This is for the health and safety of the foster children. Again, it's consistent with national standards. This is not, you know, the state, for example, saying, okay, we're going to contract with you to come fix our copiers or our printers, and as part of that contract, by the way, you can't have firearms in your home. That would be an unconstitutional condition. This is not that case. I think what courts, including the Supreme Court and this court, have been concerned with is the government coming in and trying to put those superfluous or gratuitous requirements, trying to sneak it in, you know, and doing it under the guise of regulations. You know, these regulations have been in place since the 80s for decades, and, you know, as plaintiffs pointed out below, in recent years there have been no incidents with firearms in foster homes. These work. And there is no reason under the unconstitutional conditions doctrine or under the Second Amendment analysis for this court to disrupt that status quo. I'd like to focus on – I'm sorry. Ms. Hunger, the state has no interest, I assume you would agree, in regulating a traditional family non-foster situation where there's a weapon in the house and there are children. Right. The state is not regulating that area. Right. So there is no state analysis as to the capacity or cannot examine the capacity of that family, the adults having a weapon in the state, right? There's no separate requirement other than these regulations on families. Now, to be a foster parent, you actually have to have a background check, right? Yes. So is the argument legitimate that there is actually more scrutiny of the person who has – Well, in Illinois there is a licensure requirement to possess firearms. Yes, right. And there is a background requirement, so a background check. That background check, that's a criminal background check, I think. It is, yes. I thought for a foster parent it's more extensive. Yeah, there is a more extensive background check as well. So that is, in a sense, another infringement upon their rights. Same with the searches. You know, DCFS can come into the foster parent's home at least semi-annually and search. And, you know, we're just asking for the Second Amendment right to be treated the same as those rights in this context. And absolutely nothing in Bruin suggests that this court must rule to the contrary. Now, what is your best argument that the reasoning in Camelot still applies after Bruin? Is there any room, do you think, in Bruin for us to consider whether the regulations are part and parcel of the government subsidy program? Is Bruin distinguishable because it addressed a broad prohibition, whereas the regulation here applies in a limited fashion to a government-subsidized social program, for example? Well, Your Honor, we certainly do not believe that Bruin forecloses the application of Camelot here. And I think it really is starting from the place of, you know, the government is not acting in a regulatory capacity here. That's how you get into the contractor line of cases. You know, by contrast, for daycares, the government is acting in a regulatory capacity. And that's why we are not asserting the same argument. And we do agree that just a straightforward Bruin test would apply in the sensitive places and then the history and tradition. You know, I would also note that Bruin did make clear that the Second Amendment should be treated the same as every other right. And so I think pairing those two things together, this Court absolutely can and should follow Camelot in that instance. And also note that the Court can, you know, reach the same result by going through the sensitive places analysis in addition to kind of everything that the three types of facilities have in common. You know, foster cares, for all the reasons that we just discussed, have constitutionally protected activities occurring within them. The state has an affirmative duty to protect the constitutional rights of the children in their care. So when children are in the foster homes, there's an additional constitutional relationship that is there. And we know from Bruin that a place can be a sensitive place when constitutional activities are occurring there because they identified polling places. Now, polling places, you know, are sensitive because of the activities occurring there. But in other instances, they, you know, would not be sensitive places. And so, you know, whether or not the Court gets there through sensitive places or through the government contractor approach, you know, we think that this Court should affirm on the foster care. Ms. Hunger, the expert in this case in the deposition suggested that he did not do extensive research on foster homes. Instead, relied on the balancing test. Now, doesn't Bruin preclude us from making that inquiry? Bruin does preclude a balancing test. But again, going through the sensitive places analysis, we have already, the Supreme Court has already decided as a historical matter that schools are sensitive places, and there's no need to relitigate that. You know, I would also note that, you know, some of the laws that we are relying upon are, you know, in fact, the same laws or around the same time period as those that the Supreme Court identified for legislative assemblies and polling places. And so, I do think that the expert's report is consistent with what Bruin requires. Well, accepting that schools, for example, are sensitive places, is your position that a school district couldn't provide for armed guards or a trained teacher to have a weapon? No, because what's at issue in the sensitive places question is whether the regulations that the state is imposing that would infringe upon a Second Amendment right were consistent with regulations during, you know, the relevant historical time period. So, you know, in that case, the state would be acting in a more permissible fashion than, you know, in the straight prohibition of firearms in schools that was identified by the Supreme Court. So, there's nothing in our analysis that would preclude a state from making that choice. I take it that bottom line, your argument is that daycares and foster homes fall within the sensitive places doctrine. And in the case of foster homes, the plaintiffs here consented to the regulations as government contractors, and those regulations are part and parcel of foster home safety regulations rather than unrelated gun control measures. That is correct, Your Honor. I also was wondering about something else. The district court decided the motion for summary judgment before the Supreme Court had not yet issued its opinion in Bruin. Should the case, in your view, be remanded to the district court to give it a first pass at the motion using the analysis that was set forth in Bruin? I'll hope that Mr. Masterman will answer the same question. Great. Our view is that we have satisfied the Bruin standard. You know, it is a textbook application with our unrebutted historical evidence and other evidence, and also that we have satisfied the standard when looking at it through the government contractor lens. If this court has a different view of what is required under Bruin, we of course would be glad to develop more historical evidence or to submit additional argument before the district court. But we do believe that we have satisfied our burden. Do either of you have any other questions? I do. With regard to the daycare reporting, we're obviously not bound by the expert witness or the 30B6 witness, Jorgensen, with regard to timing. How do the how and why metrics from Bruin, how are those satisfied after the daycare closes when the daycare operators are not able to go armed inside their homes? Well, they are able to go armed inside their homes, and I would also point your honor to Administrative Regulation 406.26, which I believe is cited on the first or second page of our brief, that does indicate that DCFS may only come in and inspect for rule violations during operating hours. That's the only time that DCFS has jurisdiction over the home because it's the only time it's operating as a business. DCFS can't come in and inspect after hours. It would be in violation of the rule and of their jurisdiction. Do we have a problem then because the statute says one thing and the regulation says something else? The statute has no time exception. Well, those are read together. The 406.26 should be read with the 406.8 and also the unrebutted testimony of the 30B6 witness, also what the Millers are doing. That's how the Millers understand the rule. That's how DCFS is implementing it in practice. And the plaintiffs have not put forth anything to counter that. No further questions. Thank you very much, Ms. Hunger. Mr. Masterman, we're going to give him his full three minutes, please. Thank you, Your Honor, and I may not even use the full time. I just have a couple of clarifications. One, as to the Johnson case, Your Honor mentioned it was stayed, but the court has set summary judgment briefing for April. Thank you. Two, Bruin never said that schools are sensitive places. It pointedly did not say that. It said that the historical record identifies very few sensitive places, and then it listed legislative assemblies, polling places, and courthouses. It did not list schools. Heller did mention schools, but it said in presuming that they could be longstanding, it was presuming that until the historical analysis was conducted. Heller did not conduct that historical analysis. That is the role of courts now applying the Bruin standard. And in any event, schools are not an analogy for daycares and foster homes. Daycares and foster homes are private homes where the need for self-defense of self and family is acute. And in order to justify those types of regulations, the state needs historical regulations limiting adults' ability to possess firearms in their homes. And just looking at the evidence for foster homes, for example, they say that foster homes are like the refuge system. The refuge system had no firearm restrictions. The state lacks any analogous types of restrictions here, and for that reason, these regulations are unconstitutional, and the decision below should be reversed, and judgment should be ordered, entered for the plaintiffs. And what about the thought of remanding to the district court? Your Honor, we agree that that's not necessary here. This is a purely legal question that we agree can be decided directly under Bruin as to both of the bans. Thank you very much. What would be lost by having further discovery in this post-Bruin era? We don't think that there is a need for any further discovery. There's already been a historical expert report submitted here, and even though, as you know, the framework applied in that expert report was under Helen's balancing standard, he looked at all the categories of evidence that he specifically looked at what he called restrictions on possessing, and this is Professor Cornelius' report. Well, if this case were to get further review, there's nothing like having a more complete record. And remand is an option, Your Honor, certainly, but what I'm trying to say is that if you just look at the evidence he presented, it is evidence that is, for example, in a category of a sensitive place, which is the relevant evidence here, and he has no, quote, sensitive place evidence that is anything like these restrictions. So we think you could decide it on this record. You're talking about Professor Cornell there. This is the Cornell report, yes. Thank you. Thank you very much. Thank you. Thank you very much to both Mr. Masterman and Ms. Hunger, and the case will be taken under advisement.